May it please the Court, my name is Adrian Bukovic and I represent Gregory Berkowitz as trustee of the WFT Trust and we are the Appellant and Cross Appellee in this case. This is an appeal which involves real estate located at 750 North Clinton. We had a bench trial and the issue at the bench trial was whether or not the plaintiff had a partnership interest with respect to both the ownership and operation of the real estate with Richard Urso Sr. Mr. Urso passed away in April 2003 and it was our contention at trial that the plaintiff and Mr. Urso formed a partnership in 1998 for the acquisition of the property and the leasing of the property. At the bench trial many days as a result of the trial before Judge Billick he made what I would call a split decision. Initially he ruled that although the plaintiff proved that there was a joint venture or partnership with respect to the could not enforce the ownership aspect on the basis that the claim was barred by fraudulent or improper conduct, number one, and number two by the statute of frauds. The second part of the ruling which was favorable to the plaintiff was that with respect to the leasing operation of the property that there was a joint venture arrangement between the parties which was enforceable. With respect to our appeal it goes to the ownership issue and there are two issues which are really the two reasons that the court denied the relief which we requested. The first issue is despite the fact that we proved in the trial court's own with respect to the property, did the court properly bar our claim on the basis that there was a fraudulent purpose or improper conduct, one, and the second issue is did the trial court err in barring the claim on the basis of the statute of frauds. Now, first thing on the holding or the ruling regarding the fraudulent purpose, it's not clear to me and I don't think that the judge applied the correct standard. That was an affirmative defense but it was an affirmative defense that the plaintiff had engaged in fraud and in our view any time a party claims fraud that must be proven by clear and convincing evidence. It's been the law of the state for as long as there are cases. And yet you have in the opinion the court's decision says that the only inference that can be drawn from the evidence was that the plaintiff had a fraudulent or improper purpose because the convincing evidence with that statement by the trial court and then you get into an examination of the record as to what the record was on the intent of the plaintiff in entering into the partnership agreement with Mr. Urso and there is no way that fraud or improper purpose was proven by clear and convincing evidence. Is it clear and convincing standard apply if the nature of the affirmative defense is more of a clean hands or equity does not act to help someone who is doesn't come to court? Right. This is a good question because that is what in effect Urso or the state argue and it's a different standard I agree. If it's a clean hands affirmative defense I believe it's preponderance of evidence but it cannot be a clean hands defense in this case because the law on unclean hands is an affirmative defense is that there was misconduct by the plaintiff and the defendant. It was that Mr. Wolfe in putting together this transaction did not have the trust on title so to the extent there was misconduct and I don't agree with it, it was as to some third party. It was not as to Mr. Urso so it could not have been the plaintiff and the defendant. It could not be unclean hands. That was not the finding of the trial court and I don't believe that was the affirmative defense that was asserted by the state. So now we get to was there evidence under any standard of a fraudulent purpose and there wasn't. What we had on that subject and you go to the intent of the plaintiff in this case the intent of Mr. Wolfe who testified and he testified that he did not want to put the trust on title because it would complicate financing because he had judgments that he was paying on. That's a quote from his testimony that he was paying on. Yet the trial court determined that the only inference that could be made from the evidence was that Mr. Wolfe did not want the trust on title in order to avoid judgment creditors. You cannot reconcile that. But in effect, we don't have evidence of what he was paying, how much he was paying, how long he was taking to pay. And when his name isn't on title, it prevents a creditor from having another avenue of either speeding up the judgment or having a more collectible judgment because there's a way to get liens or whatever on a piece of land that's not on title. It did not in this case. First of all, there's no evidence of that. Second of all, of any creditor being impaired, hindered, or that any creditor. Do we need that type of evidence? I mean, it's clear when you don't know that someone who owes you money doesn't own a piece of income producing property that it has prevented you from a very strong way of securing your debt. It could, but not in this case. First of all, if the trust had been on title, that would have meant that the trust was a beneficiary of this land trust with Metropolitan Bank. So in terms of a public record, it would have made no difference to the outside world whether or not the trust was a beneficiary, a named beneficiary in the land trust document. There is no creditor who would have done a title search who would have seen that. So the idea that somehow a creditor was deprived of information or that was the purpose because the trust wasn't a beneficiary of the land trust makes no sense because it wouldn't have mattered. Number two, the evidence was, uncontradicted, that the trust's interest in the real estate was set forth on Mr. Wolfe's income tax returns because the income flows through. Now, if he had... Did he indicate on his income tax that he received income from the purchase of this property? I didn't see that in the record. No, he did not. He indicated that he had an interest in the real estate or that the trust did, but because one of our exhibits, I think it was exhibit F or G, we could not get the income information from Mr. Erso in the year 2000. That was one of the exhibits. Right, but what about 98 and 99? No, Your Honor. There was no information on the income tax return about what the income was, but there was disclosure that there was an interest in the real estate so that if a creditor sought information about Mr. Wolfe's income or the assets which he owned, it would have been disclosed on an income tax return. And I can tell you from doing that work from both sides as a plaintiff and a defendant with judgment debtors and judgment creditors, one of the first things you ask for is an income tax return. So no creditor would have been deprived of information about the trust's interest in the real estate if that was the case. Now, there is no evidence, again, that any creditor was interfered with, but if we go with intent, the fact that the trust's interest was disclosed on the income tax return displays, demonstrates there was no fraudulent intent. Now, if you look at the cases on this fraudulent purpose, whether cited by Mr. Erso, cited by the trial court, or in Gunn v. Sobecki, because that's mainly what the trial court relied on, there are four cases. Gunn v. Sobecki, American National Bank v. Vinson, Hanley v. Hanley, and I don't know how to pronounce the last case. It's Regerny or something like that. Regerny involved an intervention and ultimately the appellate court found that the plaintiff did not engage in misconduct with regard to a vote on stock. I don't think that case has really any place other than it states a general proposition. The other three cases in which the court found that there was a fraudulent purpose or improper conduct by concealing an ownership in real estate, in each one of those cases there was a sworn statement by the plaintiff, the party seeking to enforce an interest in the real estate, either an admission that he was trying to avoid creditors, or in the case of Gunn v. Sobecki, where the lawyer just blatantly lied. So in American National Bank v. Vinson, it says quite clearly the plaintiff admitted that he transferred the property into his brother's name in order to avoid creditors. In Hanley, the plaintiff admitted that he put the property in his wife's name to avoid judgment liens. And then in Gunn v. Sobecki, you have the sworn, notarized bill of sale prepared by a lawyer in which he said he sold that coin collection. So in each one of those cases, you have either an admission, you have sworn testimony, which the court relied on to negate the plaintiff's claim. You do not have that here. You have Mr. Woolf's testimony, not that he was avoiding judgment creditors, but that he was, in his words, paying on the judgments. So that makes this case completely different than those in it, both from a legal standpoint, those cases don't apply, and from the evidentiary record in this case. There was no evidence to draw in one conclusion, as the trial court said, that Woolf acted with a fraudulent purpose. Quite the contrary. He was paying his creditors, whereas all of these other plaintiffs in those cases, Hanley, Gunn, Vinson, they weren't. So you have exactly the opposite here. There's no concealment. I mean, that's really what you're talking about. Did the plaintiff conceal its interest in the real estate to avoid creditors? Other than Mr. Woolf's testimony that in 2000 he listed the interest on his schedule, I think it's schedule E, is there anything else that demonstrated that he didn't try to keep this secret? Because I could not find in the record the taxes. No, the tax returns themselves were not in the record, and that's argued on the opposite side against us. And my point on that, and I'll address your question in a minute, is that they never asked us to produce the income tax returns. So this is not one of these cases where the opposite party should get an inference that somehow because the tax return's not in the record, it doesn't say what we said. His testimony is unrefuted. Now, to answer your question, what else is there? There's the testimony of the tenant for the property, in which he testified that he understood that Mr. Woolf was a partner in the property. I'm not talking about as to the partnership. I'm talking about hiding the interest. I know there's a lot of testimony that they are joint ventures. Correct. But him trying to, other than the information that's supposedly on the schedule E, is there any other way that his creditors would have known that he had an interest in this $800,000 piece of property? Sure. A creditor, let's assume a creditor has a citation to discover assets or ask for information. You would ask for bank accounts. Two of the exhibits admitted into evidence were the earnest money checks for the property. Both checks state WFT Trust. So a check goes through the banking system. It's not concealed. You said there are two checks. There's a $50,000 check and there's a $25,000 check. I thought that one wasn't cashed. I thought that was returned. But the check that's in evidence, Your Honor, is the $25,000 initial check. That wasn't cashed. Right. Isn't that the one that was? I think there are two $25,000 checks. It's a little confusing in the record. Certainly one was returned. That was Mr. Goodbar's testimony. But in evidence, two checks both say WFT Trust, and that was for payment for this property, and the trial court so found. There's also the buyer's closing statement, which says WFT Trust, contribution, $50,000. Are those public records? Well, the closing statement would be something that is given to the other side at a closing. I said, but is it if I was a creditor and I was looking for it? Well, it's not recorded, but neither are tax returns. A creditor has to ask for information. The creditor would have found the interest in the real estate and would have found the payment toward the purchase of the real estate. You also have third parties who testified that Wolf was open about the trust having an interest in the property. And there's no evidence. I want to know, really, just because the tenant on the property says that they were acting like partners, or there was some kind of mutual thing going on between them, how that gives us enough evidence to leap to that they were partners in the ownership, they were partners in getting the rent, that this is 50-50, when even the numbers don't even come close to that. You have admissions by Mr. Urso. What admissions by Mr. Urso? You have admissions that Mr. Starfman testified that Mr. Urso said that they were partners in the property. But what does that mean? I mean, does it mean that I'm going to own it, I'm going to take the rent, and you, Mr. Wolf, go out there and make sure, you know, you negotiate the lease, that's our agreement. But I don't see how any of that evidence tells us what the nature of this arrangement was. Well, Mr. Goodbar was the lawyer for the partnership who did the real estate closing, and he testified that the parties had a partnership agreement with respect to the property. Urso was going to be on title and get the financing. Wolf was going to negotiate the purchase price, the lease terms. He identified the property. Wolf testified that he aided in collection of the rent when there was difficulty with the real estate taxes. So if you look at the law on what facts lead to the conclusion that there's a partnership, it is how the parties acted with each other. Therefore, Urso's statements... Well, even if I agree with you that they had some kind of friendly arrangement, I don't know the details of that arrangement. Well, yes, you do, from the record. There's only evidence from the plaintiff as to what the agreement was. Defendant never identified any other transaction. In other words, in these kind of cases, maybe you have a defendant who says, well, no, there wasn't a partnership, it was a loan. It was a gift. It was something. They said nothing. And the trial court recognized that and asked those questions in the closing argument. Are you saying that there's a loan? No. Are you saying there's a gift? No. So what was it? Well, the testimony from about six witnesses, including a lawyer, was that there was a partnership to purchase the property, to operate the property. You've got written documents signed by Urso, which acknowledges that the payment by the trust was a contribution toward the purchase of the property, a term which the Uniform Partnership Act recognizes as the capital, the money that goes into the partnership. The IRS laws also recognize that term as the payment of money for a partnership. Now, the evidence was that there was a loan and that the money was supposed to go toward payment of the loan.  So it's perfectly logical and consistent with the testimony that Mr. Urso collected the rent and it was used to pay the loan. So I think there's more than ample evidence of a partnership. I've overstayed my welcome already. No, no, I just know I kind of threw you off there. Okay. So I'll just, may I just, one more minute or two more minutes? I'll be very quick. There's no fraudulent purpose. The cases don't reconcile with this. There is no sworn statement that's inconsistent. He's never taken a position in a different legal proceeding. There is no admission. In fact, the only testimony on intent comes from Wolf that he was paying his creditors. There was no liquor license at issue in this case. So the idea that somehow the interest was concealed because of a liquor license doesn't make sense. And quite honestly, there is nothing illegal about having property held so your name doesn't appear on title. Illinois law allows it with land trusts. We cited that Corsic case, an Illinois Supreme Court case, 13 Illinois 2nd, which says it's acceptable for a partnership to hold real estate in the name of the partnership, in the name of one of the partners, or in the name of a stranger. So there is nothing per se illegal about having title held in a name other than your own.  Thank you. Thank you. Good morning. Good morning. May it please the Court. My name is Mary Elizabeth D'Amico, and I represent the estate of Richard Urso, Sr., deceased. The estate is the appellee cross-appellant in this matter, and the underlying defendant in this case. I'll start first with the issue of the fraudulent or improper purpose. It's our contention that the trial court did not err in granting our affirmative defense on this matter. The testimony all established that as of the date of sale, Mr. Wolf had been recently released from the penitentiary and had two very large outstanding judgments against him. One in favor of the Environmental Protection Agency and the other in favor of the state of Illinois for participation in so-called scavenger sales. Now, it is a fundamental principle of equity law that courts in equity will not let one take advantage of his own wrongdoing. In fact, in Gunn v. Sobecki, I'm sorry, in Hanley v. Hanley, the court noted that courts of equity have broad discretion to deny any equitable relief in this matter, in fact, in enforcing partnership agreements. Now, as far as the evidence goes with regard to Mr. Wolf's concealment of his interest in this property, we would submit that all of the testimony demonstrated that it wasn't just judgment predators that Mr. Wolf was concealing his property from. It was the city of Chicago. On this particular property is an entertainment use, which is a gentleman's club, which requires a special use permit. I think it's called an entertainment license. The tenant testified that the license that's held by the tenant at this particular location is one of two in the city of Chicago. Now, the testimony of, I believe, Mr. Goodbar, who is Wolf's longtime attorney, even testified that Wolf did not want his name to appear on the title because of concerns over obtaining the special use license for this property. Mr. Starkman, Wolf's friend and occasional expert witness in litigation, stated that Wolf was concerned not only about his judgment predators, he was concerned about the special use license, his notoriety, and how it would disrupt the transaction had people known that he was involved in this particular building. Now, I think the evidence also demonstrates, and as pointed out by Your Honor, Wolf did not produce any tax returns in this trial. It seems like it would make sense that if you're making a claim for half of the proceeds of a very valuable property, including rental income, you would submit your tax returns for review of the court. But he did not do that. All we have is his testimony saying, yes, I disclosed the building interest on my property. Now, there was no income disclosed on that property as well. As far as the earnest money, the checks that were referenced by Mr. Vukovich, Mr. Goodbar testified that that Exhibit A, that check, was actually written, and if you look at the date on it, it's written in February. And that was months before this particular deal went through, through the closing. And Mr. Goodbar testified that that was actual earnest money that was returned back to them. And he, the attorney, could not testify, could not answer as to what happened to that earnest money. So as far as having a check out there that shows Wolf's interest, we would submit that there just simply wasn't that evidence. Not even for the $50,000? There is a $50,000, but it says WFT Trust on it. And that is not a matter of public record. No one would be able to see that particular check, even if you, I know you would have to subpoena that to get that information. We often do that in empty domain cases to get information about a particular closing. You subpoena the files because you can't get them any other way because they're not a public record. Now, as far as the case of Gunn v. Sobecki is addressed, our Illinois Supreme Court has stated that it will not assist someone who purposefully takes their property and for improper purposes puts it out of his or her control and then comes back to the court and seeks the aid of the court to help them get that property back after the fraudulent purpose has been accomplished. Now, it's been argued that there was no proof of a defrauded credit in here. The Illinois Supreme Court states that that doesn't matter. It's not the effect of the fraudulent activity or whether the fraud was even successful. It's the intent of the person in putting the property out of their name and then coming back and seeking aid of the court. What happens at that instance, the court says, we will leave the parties as we find them. And that's what we're asking. The parties as the court found them involved Mr. Urso's estate owning 100% of the property with 100% of the power of direction. In other words, the estate now has the ownership interest and it also has the right to receive rents on the property. And we're asking the court to leave the parties as it found them. And it's our contention, which is subject of our cross appeal, that the court did not leave the parties as it found them. But as far as the improper or fraudulent purpose, the testimony is well established that Mr. Wolf had a significant interest in keeping his name off this property for creditors and the city of Chicago. And that was fully supported by the evidence. Counsel, how are you proving that intent that you say is what is relevant? Your opponent has made it clear in his argument that it's not illegal to use others' names even. So how are you showing that intent clearly? Yes, and that's a good question. As far as Mr. Wolf's testimony goes, he even testified that he wanted to keep his name off the property because he had judgments against him. Now he says, I had judgments I was paying on them, but he still had judgments against them. And that shows his intent to keep it away from the city of Chicago, I'm sorry, from the creditors. Now with regard to the intent of the special use license, the witnesses we have and the testimony is what we have as to what Mr. Wolf's intent was. And his attorney, who they rely upon for testimony as to the existence of this joint venture, which we contest, even stated that Mr. Wolf wanted to keep his name off the property because of the special use license. So as far as the improper purpose goes, we believe that under Illinois case law that the court had broad discretion to deny the equitable relief in this matter. And whether you look at it, whether you look at the intent of this action, it becomes clear that Mr. Wolf's name was purposely kept off for an improper or fraudulent purpose, and the trial court's decision was well-founded. Now as far as the, I didn't know if you wanted me to go at this point into my cross appeal. However you want to use it. Okay, thank you, thank you, Your Honor. In fact, it's our contention that the cross appeal in this instance is that the trial court erred when it found the existence of a joint venture. We're also maintaining that the trial court erred in denying some of our affirmative defenses based on the improper conduct, the statute of frauds, and the public policy argument. Finally, it's our contention that the trial court erred in finding that this particular suit was not barred as untimely under the Broadway Act. So starting with the finding of the joint venture, it's our contention that the evidence did not support the finding of a joint venture in this instance. A joint venture arises out of contract law and requires a meeting of the minds between the parties. And the relevant inquiry and the most important inquiry is the intention of the parties. And it's not just Mr. Wolf's intention here. It's what Mr. Erso's intention was too. And unfortunately, Mr. Erso is deceased, so all we have left are the documents, all evidence that he was 100% owner, and that's all we have as far as intention goes. Under Illinois law, in order to determine intention, you have to find certain elements in order to find a joint venture. Now with regard to the joint venture, it has to show that there was a joint interest as far as a contribution of property, financial resources, knowledge, and skill. Another element that's required is that there has to be some degree of joint proprietorship or joint management and control. And that's very important because we contend that was not present here. And finally, there has to be an agreement for sharing of profits and losses. If you don't have any of those, then there is no evidence of a meeting of the minds to create a joint venture. In this case, the evidence is clear that there was no joint partnership tax returns ever filed. Even when Mr. Urso was alive. Additionally, under Illinois law, the evidence that there was no partnership tax returns is indicative of the fact that there was no joint venture. Furthermore, Urso took on 100% of the liability for the mortgage on this property. Now that's contrary to partnership law, which says that all of the partners will have equal liability when it comes to partnership debts. So under the case law, it demonstrates that that is also indicative of the fact that Mr. Urso did not come to a meeting of the minds with Mr. Wolfe and enter into a joint venture. Now, perhaps the most glaring evidence here is the fact that the contribution was $50,000 of a total purchase price of $627,500. Now, that is definitely evidence of the fact that this agreement was not in the instance of a joint venture whereby Mr. Wolfe, what he claims, is a 50% owner of the property and entitled to 50% of the rents from here on out. This is a very valuable property and a very valuable tenant. Now, with regard to the evidence that was relied upon by the trial court, now, we have argued that this evidence is conflicting and biased and things like that, which we still contend it was. However, if you even take that evidence on its face, at best it shows that there were some friends of Mr. Wolfe who overheard him and Urso refer to each other as a partner and talk about a partnership. What is missing from any discussion in this whole case is what the terms of that partnership was. Mr. Wolfe did not establish the duration, what the agreement was with Mr. Urso as far as profits and as far as surpluses were to be handled, and we don't have any evidence of anyone knowing that. Furthermore, with regard to the evidence of his friends, just really briefly, it's a small point, but the court summarized that the trial court relied upon this alleged meeting that occurred at the Atrium Restaurant in which Mr. Urso announced that he was going to step into this partnership. During that meeting, the trial court stated that Starkman was there, Daniel Kravitz, who is Mr. Wolfe's best friend, was there, and they all overheard this information. Starkman never testified to being at a meeting at the Atrium Restaurant. In fact, his testimony on that stated that he wasn't present with regard to Sunday meetings at that restaurant. As far as the testimony with regard to Goodbar, that's the attorney who is supposed to have represented the joint venture, Mr. Goodbar stated that he had no information as to the specifics of this joint venture. He doesn't know the duration, and he didn't know the provisions for surpluses. And this is supposed to be the attorney who was allegedly representing the joint venture. Therefore, it is our contention that the trust in Mr. Wolfe did not establish that there was a joint venture issue here. Now, the trial court stated that it was not required to find a joint venture under the clear and convincing evidence standard, but it did say under preponderance of the evidence or clear and convincing evidence, we find that there was a joint venture, to state things accurately. However, Illinois law provides that if there are writings out there that indicate that this is some sort of agreement other than a partnership, then the standard is very clear and convincing. And in this instance, the ownership documents, the mortgage documents all evidence the fact that Mr. Erso is 100% owner of this property. Therefore, it is our contention that the trial court was required to apply the very clear and convincing evidence standard, and it's our contention that under that standard, the existence of the joint venture was not proved by Mr. Wolfe. I know you don't have that much time, so I want to ask you a question. If we were to rule that there was a joint venture, however, because of the improper fraudulent manner in which the property was purchased, Mr. Wolfe couldn't get part of the money to be sold the property. I want your argument on why this is not separable. Why, as the judge ruled, Wolfe could get anything. Okay. And this is our argument. The trial court ruled that Wolfe could not assert an ownership interest in the property. An ownership interest in the property includes the right to receive rents. Therefore, the trial court ruled that the right to receive rents is essentially barred under this other affirmative defense. And under our contention is that the receipt of rents, while you can assign rents to people, absolutely, I mean, you can assign it under a mortgage, of course, but in this instance, not only was the judge's ruling that this particular person does not have a property interest in 750 South Clinton, it is also our contention that a major part of the contract was ruled to be invalid and unenforceable. Thus, the contract becomes void as a whole. Now, with regard to the remaining points on our cross-appeal, we have a couple... I think you're really close to your time. Okay. We would just argue just very quickly that under the Probate Act, the trial court found that this was not barred because of the six-month deadline. The Probate Act requires all claims to file within six months after the opening of the estate. Mr. Wolfe testified that he knew when Mr. Erso died, and his attorney testified that he made Mr. Erso aware of the opening of the estate. The trial court found that because the Act requires the administrator to serve actual notice on the individual known claimants, and that Wolfe testified that Mrs. Erso knew he was a claimant, the trial court found that that met the requirements. However, on the last day of testimony, Mr. Erso Jr., who is the administrator... Mrs. Erso is not the administrator of the estate. Mr. Erso is. Richard Erso Jr. It's confusing. And he testified that he was not aware of the claim until he received the complaint in the mail, or filed the complaint. Now, that complaint was filed well after the six-month deadline under the Probate Act, and that's all we would draw our attention to. And so in conclusion, we're asking the court to leave the parties as it finds them with the estate of Richard Erso in control of the property and in receiving rents. Thank you. Thank you. Thank you. I want to correct myself about that check, the $25,000 check. The testimony was that was the original earnest money check. It does say trust. It was returned, yet the trial court found, based on oral testimony, that the capital contribution of the Wolfe Trust was $75,000. I know he has found that, but I didn't... You're correct, Justice Lankford. All right, thank you. So counsel addressed several issues, but, again, we get back to what was the... this case is about intent, really, whether you talk about the... whether there was an intent, a fraudulent intent, in not having the trust on title, and the same argument about the intent of the parties in this creation of a partnership. And so the question is, and I pointed this out initially, is defendants never came forward with an alternative to what this arrangement was. They never identified it as anything... But did they need to? Yes, they did. Why did they need to? You were coming forward to say it. Certainly, as the plaintiff, we had the burden of proof. But we get to this issue of the reference to Seidman v. Harris and what is the standard of proof in this case. Now, counsel said that it should be clear and convincing evidence as to whether a partnership exists, and that Seidman case is the case they rely on. And I think it's also addressed by the trial court in its opinion. In that case, the court held that if there is the existence of documents which indicates there's some relationship other than a partnership, then the plaintiff who's claiming a partnership must prove a partnership by clear and convincing evidence. Otherwise, it's a preponderant standard. Now, in Seidman, what made that a clear and convincing standard was that there was a promissory note between the plaintiff and defendant, and so the court found there was a debtor-creditor relationship between the parties rather than a partnership, unlike here. Now, Mr. Wolf, whatever the world may think of him, is a shrewd businessman. He does not pay $75,000 as a gift. There is no note. There is no evidence that there was a loan. There is evidence that on a document signed by Mr. Erso that the Wolf Trust paid $50,000 as a contribution.  And it goes to the intent of the parties with respect to what this transaction was. And quite clearly, not refuted, a payment by the trust characterized as a contribution and signed by Mr. Erso we say is a sufficient writing to prove intent to create a partnership and to overcome the statute of frauds. That's a big leap. I don't think so. The cases on what you need in terms of a writing say any writing, a note, a letter. This is a document prepared by the lawyer for both parties, for Erso and the trust, and it's signed by Erso and it says what it says. It says I got $50,000 contribution, undefined, for the purchase of a property that was over 10 times that. Okay. But you have a course of dealing also. You have the Harlem property referenced in the record. No doubt we have the closing statement from that in which the parties were partners, in which there was an equal distribution of the profits. We have the letter. But no challenge. Okay. I just don't find it relevant. Well, it's relevant as a course of conduct as to what the party's relationship was. There's no doubt these two were sophisticated business people. They were friends. And the deal was that Mr. Erso stepped into the shoes of Dan Kravitz. So counsel argues we don't know. Well, it was a statement at a breakfast or a lunch. It seems the meal changes sometimes. That's true. I'm not doing it. And Erso's saying, oh, okay. I will. I will. But I will what? There's no testimony that says I'll do it. I'll be just like him. I'll do it just what they were going to do. I disagree. There's testimony by Starkman and Wolf that Erso was stepping into the shoes of Kravitz under the exact same terms Kravitz testified to that, too. And Kravitz testified that he told the banker, Slonina, that Erso was taking his place in the transaction and also, relevant fact, that the bank officer was informed of the trust's interest in the real estate. So he had nothing. I mean, the banker never testified. The banker did not testify to that. No, he didn't. He said he didn't recall. He said he didn't recall when asked that question. Now, he didn't say it didn't occur. He said, I don't recall. Now, this is a 98 transaction, and he's at trial in 10. I mean, that's understandable. But the way it works is, as I understand it, you have testimony by a witness who testifies to a conversation. The judge was able to assess the credibility, and he's the one, the judge, who found that there was a partnership. So there's no doubt that the trial court, who specifically references determining the credibility of the witnesses and weighing the evidence, found there was a partnership. The only thing the trial court didn't do that, you know, disappointed us greatly, was that the court didn't enforce that partnership interest with respect to ownership because of the statute of frauds and because of this fraudulent purpose. But when you go back and look at the record and look at the cases and look at the intent, the evidence on intent, including this letter from Mr. Berkowitz in August 2000 and letters by Mr. Wolf in August 2000, you would have to believe that they created those documents after the fact to support the case that we had 10 years later. There was no finding that that occurred. Those exhibits were admitted into evidence and state, Mr. Urso, we are 50-50 owners on the property. We need some information so that we can accurately prepare our taxes. Please give us that information. That is not the conduct of a person who is concealing something, who is trying to not act like a law-abiding citizen, if I can say that about Mr. Wolf. That is the conduct of a partner, and it was not refuted. What was not refuted? The documents themselves were not. There is no response in the record which says you're crazy, you're not a 50-50 partner, or something which would indicate that Mr. Urso disagreed with this position. This is what happened here. If Mr. Urso was alive, this case never would have occurred. Unfortunately, he passed away. Title was not as it should have been, and in that void, the estate wanted to claim there was no partnership. The trial court said, no, that's not what happened. There's some legal reasons I'm not enforcing it, but it happened. And so what they're asking for is a complete forfeiture of the plaintiff's interest in the real estate on the basis that if a partner dies, it goes to the survivor. Well, that's not the law. It never has been. And in the face of testimony and documents and money paid by a shrewd guy to have an interest in real estate. So I would ask that you reverse that portion of the trial court's opinion, which found that the plaintiff's ownership interest in the real estate is barred, and affirm the second portion with respect to the leasing and operation of the property. Okay. Thank you very much, Counsel. I'm just going to start with the last point made by Counsel with regard to the August 2000 letter. It is our contention that the non-response by Mr. Urso was barred by the Dead Man's Act and should have not been considered by the trial court. There's an awful lot that is inferred from those letters, and it was actually inferred by the trial court as well. The argument is, well, you didn't dispute these. You didn't make a response to this. Mr. Urso is no longer here to dispute those or to explain perhaps why he didn't make a response. Even if that evidence should have came in, if anything, it would show that Mr. Urso's intentions were not the same as Mr. Wolf's and that there was not a meeting of the minds with regard to the joint venture. Now, with regard to the trial court's decision, the trial court, and this was a manner I meant to address on my initial time, but they brought up the trial court's finding of whether it was clear and convincing evidence and the finding of the existence of the joint venture. It's our contention that the trial court did not consider the relevant factors that the case law requires it to consider. It never enumerated whether there was the joint enterprise, whether there was joint management or control that is required under the case law. Now, with regard to the writings and what the statute of frauds requires, it is true that you can have informal writings under the statute of frauds. However, the case law provides that you need to have some sort of minimal writings, the party's names and the terms and conditions of the alleged joint venture. The closing statement simply does not have that. The closing statement is just WFT contribution. It doesn't even say partnership contribution. Now, it was brought up that there was another transaction between the parties. We believe that to be irrelevant. However, the trial court did consider the Harlem Avenue property, which is located in Bedford Park. Now, if you look at the evidence, it shows that the closing statement in that issue actually stated partnership contributions had both of their names on it. That's in sharp contrast to what we had here. All we had here was WFT contribution, $50,000, and that's it. So we would submit that if the Harlem property sale is to be considered, the differences between the writings in that situation clearly show that that was a different scenario than we have here. Now, with regard to the other writings at issue, the lease did not satisfy the statute of frauds either. It did not have the essential name. It didn't even have the names in it. The lease had Mr. Urso's Land Trust listed as the landlord. As far as the WFT Trust was not even mentioned, nor was Louie Wolfe's name mentioned. Anyone looking at that lease would have no idea that Mr. Wolfe or the trust was alleging to be a landlord on this matter. Now, it's also our contention that the testimony with regard to the earnest money was not established, and the trial court was in error on that. The testimony that we have is that the $25,000 check was written in February. It was returned, and Goodbar could not tell who contributed that $25,000. In fact, the evidence at trial demonstrated that there was never a resolution as to that $25,000 dispute, and Goodbar wrapped that up. In conclusion, we would submit that the trial court's finding of the existence of the joint venture was not supported under either preponderance of the evidence or clear and convincing, and that the writings at issue do not satisfy the statute of frauds. We would ask that the court leave the parties as it finds them. Thank you. Thank you, Poe. We will take the matter under advisement.